**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | |
|---|---|
| COLLISION COMMUNICATIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> APPLE INC., <br><br> Defendant. | Case No. 7:26-cv-00107 <br><br> **JURY TRIAL DEMANDED** |

**PLAINTIFF COLLISION COMMUNICATIONS, INC.'S**
**COMPLAINT FOR PATENT INFRINGEMENT**

Collision Communications, Inc. brings this action for patent infringement under 35 U.S.C. § 271 against Defendant Apple Inc. ("Apple" or "Defendant") and alleges as follows:

**PARTIES**

1. Plaintiff Collision Communications, Inc. ("Collision" or "Plaintiff") is a Delaware corporation with its principal place of business at 20 Depot St., Suite 2A, Peterborough, New Hampshire 03458. Collision was formed in 2011 and is a telecommunications research and development company that creates and implements proprietary methods for reducing signal interference in networks.

2. On information and belief, Apple Inc. ("Apple" or "Defendant") is organized and existing under the laws of California, and is registered to do business in Texas. Apple has a significant present in Texas and has maintained a regular and established place of business with offices and/or other facilities in this District at least at 12545 Riata Vista Circle, Austin, TX 78727; 6900 W Parmer Lane, Austin, TX 78729; 320 S. Capital of Texas Hwy, West Lake Hills, TX 78746; 7400 San Pedro Avenue, San Antonio, TX 78216; 3121 Palm Way, Austin, TX 78758;

15900 La Cantera Parkway, San Antonio, TX 78256; 8401 Gateway Boulevard West, El Paso, TX 79925; and 2901 S. Capital of Texas Hwy, Austin, TX, 78746.

3.    Apple Inc. may be served through its registered agent for service of process, CT Corporation, 1999 Bryan St., Suite 900, Dallas, Texas, 75201-3136.

## JURISDICTION AND VENUE

4.    This action arises under the Patent Act, 35 U.S.C. § 1 *et seq.*

5.    Subject matter jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 and 1338(a).

6.    This Court has personal jurisdiction over Defendant because Defendant has sufficient minimum contacts and/or has engaged in continuous and systematic activities in the forum as a result of business conducted within the State of Texas and the Western District of Texas. Personal jurisdiction also exists over Defendant because, directly or through subsidiaries, makes, uses, sells, offers for sale, imports, advertises, makes available, and/or markets products within the State of Texas and the Western District of Texas that infringe one or more claims Asserted Patents. Further, on information and belief, Defendant has placed or contributed to placing infringing products into the stream of commerce knowing or understanding that such products would be sold and used in the United States, including in this District.

7.    On information and belief, Defendant also has derived substantial revenue from infringing acts in the Western District of Texas, including from the sale and use of infringing products.

8.    Venue in this District is proper under 28 U.S.C. § 1391(c)(3) and 28 U.S.C. § 1400(b). Apple maintains regular and established places of business in this judicial district, and has committed acts of infringement in this district.

**THE ASSERTED PATENTS**

9.      Collision is the sole owner of, and possesses all rights, interests, and title of U.S. Patents 7,463,703 (the '703 patent), 7,920,651 (the '651 patent), 7,593,492 (the '492 patent), and 6,947,505 (the '505 patent) (collectively, the "Asserted Patents"). These patents are attached to as **Exhibits A–D**, respectively. Each patent is valid and enforceable.

10.     The patents-in-suit stem from work at BAE Systems ("BAE"). BAE is a multinational defense, security, and aerospace company, which develops solutions for the British and U.S. Armed Forces. At the time of the inventions at issue in this case, BAE was working on multi-user detection techniques to address the problem of interference in then-existing communications technology. Multi-user detection allows a system to mitigate or encourage interference between multiple signals in the system, and uses advanced techniques to either cancel out the interfering signals or separately receive multiple interfering signals simultaneously.

11.     The Asserted Patents address various techniques for improving the way communications system deal with interference.

12.     The '703 patent is titled "Joint Symbol, Amplitude, and Rate Estimator." The claims are drawn to apparatuses for processing digital data streams from multiple users which follow this general scheme: (1) an initial amplitude estimation unit processes the data stream and producing initial amplitude estimates on a first iteration; (2) a joint amplitude estimator produces updated amplitude estimates; (3) a symbol estimator also produces symbol estimates; and (4) a bank of decoders produces a plurality of symbol likelihood estimates for each user, where those estimates are iteratively fed back to the symbol and joint amplitude estimator. *See generally* '703 patent, claim 1.

13.    The '703 patent describes advancements in communications technology and signal processing to provide high quality, real-time processing for multiple access and overloaded systems. Specifically, as communication networks and the wireless sector grew, many users would transmit energy on the same communications channel, making it difficult for receivers to detect information associated with a particular user. *Id.* 1:49–61. The signal of interest could not be received or the quality of its reception would be significantly degraded. *Id.* 1:59–1. Attempts to solve these problems were unsatisfactory: One of the primary disadvantages of prior art implementations was their inability to handle overloaded conditions. *Id.* 5:50–53. Multiuser detection systems emerged, which are able to take full advantage of all information available at the receiver, by making use of any "knowledge" that the receiver has about the interfering signals, to cancel interference. *Id.* 5:58–66. But multiuser detection, too, had challenges: the computations could be complex and time-consuming, making real-time operation impossible. *Id.* 6:45–49; 8:28–35. The inventors thus proposed a system that provided an efficient means for jointly estimating symbols, channel amplitude, and data rate transmitted in a super saturated communications channel. *Id.* 8:42–51. The invention's approach—where likelihood estimates are iteratively fed back into the symbol and joint amplitude estimator—dramatically reduces the number of computations needed, such that reliable operation can be achieved in a real-time implementation. *Id.* 25:42–54. And the claim limitations themselves are unconventional, considered both individually and as an ordered combination.

14.    The '651 patent, a divisional in the same family as the '703 patent, is also titled "Joint Symbol, Amplitude, and Rate Estimator." Drawn to the same problem in the art, the '651 patent offers a related but different solution. The invention claimed therein is a joint amplitude estimator that iteratively processes a data stream. But the '651 patent computes a filter that is used

to compute individual amplitude estimates. *See generally* '651 patent, claim 1. An analogous method is also claimed. *See id.* at claim 6. As with the '703 patent, the '651 claim limitations themselves are unconventional, considered both individually and as an ordered combination.

15.    The '492 patent, titled "Combinational Hybrid Turbo-MUD" is generally directed to addressing problems associated with multi-user detection within a multiuser wireless network where noise is present. Existing systems were not able to keep up with real-time transmissions or had poor quality output when there were many users or too much interference. *See, e.g.*, '492 at 4:48–5:4, 6:43–63 (high complexity MUDs might "require too many computations to keep up with real time transmissions," while faster, lower- complexity MUDs could have "poor quality output when there are many or strongly correlated interferers or users."). The inventions of the '492 patent improve telecommunications technology by using a decision unit to select, for a given situation based on a set of decision criteria, particular MUDs as appropriate. The '492 claim limitations are also unconventional, considered both individually and as an ordered combination.

16.    The '505 patent is titled "System For Parameter Estimation and Tracking of Interfering Digitally Modulated Signals." The '505 specification explains that parameter estimation units are able to "derive channel parameters which uniquely distinguish the characteristics of each individual signal regardless of the fact that the signals exist in the same communications bandwidth and at the same instant in time." '505 patent 1:19–25. In reality, however, accurate parameter estimation is difficult in a multiuser environment because of the co-channel multiuser interference and because the received power and phase of a signal vary from burst to burst, making parameter estimation difficult. *Id.* 1:32–41. Conventional parameter estimation also requires a serial approach, creating blanks and blackout periods where simultaneously occurring signals are being ignored and not tracked. *Id.* 1:46–57. To address these issues, the inventors devised a system that

could simultaneously track all of the interfering signals in real time by providing ultra-fast param-

eter estimation:

> In order to be able to accommodate multiple interfering signals on the same communication channel in which the signals are purposely allowed to interfere with one another to be able to make maximum utilization of a traffic channel, in the subject invention, initial estimates are made of various parameters utilizing the interference-free received signal on the acquisition channel and the usual traffic channel training sequences which are transmitted to identify each mobile user and to set up timing for the burst transmission from the mobile phone. Thereafter, when a first user or corner exists and is assigned a particular traffic channel, initial parameter values from the acquisition channel are utilized in the tracking of the channel transfer function, including power, multipath structure, timing offset and frequency of this first corner or first signal in the traffic channel.

> Thereafter, when a second interfering signal exists on the traffic channel, the system recreates the training sequence portion of every signal on the traffic channel prior to the last signal entering, and subtracts this from the training signal portion of the received signal to provide an interference-free signal from which to calculate estimates of the parameters for a newcomer to the channel. The above utilizes the training signal portions of the received signals. What this does in essence is to single out the signal of the newcomer.

> Having estimates of the various parameters of the newcomer to the channel and assuming that there are two or more interfering signals on the channel, parallel processing is then utilized to isolate each of the signals assigned to the same channel by utilizing the previously described method of recreating then subtracting training sequence portions of the signals. A slightly modified version of the parallel processing portion which utilizes cascaded processing steps is also offered in the event parallel processing is not desirable.

> The result is that the system can simultaneously track all of the interfering signals in realtime by providing ultra-fast parameter estimation, with these estimated values utilized by the signal separation algorithm.

*Id.* 2:8–46.  The limitations recited in the claims are also unconventional when considered alone

or in an ordered combination.

## THE PARTIES' HISTORY

17.     Collision was created in 2011 with the goal of developing software products that could bring BAE's groundbreaking communications technology to the broader commercial market in which BAE did not traditionally operate.

18.     Collision began its business by developing advanced simulation environments to emulate real world cellular networks and showcase the massive gains Collision's software techniques could provide to interference-laden wireless networks. Collision's goal was to collaborate with existing cellular hardware manufacturers to bring Collision's advanced software solutions to their products.

19.     Collision believed that the ever-increasing congestion of cellular and Wi-Fi networks, as well as the emergence of techniques like MIMO to employ simultaneous/overlapping data streams, meant that Collision's advanced interference technology would become invaluable to both base station and handset manufacturers in the coming years.

20.     Collision initially targeted base station manufacturers like Samsung, Nokia, and Ericsson as potential early adopters of Collision's technology, and pursued lengthy collaboration efforts with both Samsung and Nokia, which lasted until 2019.

21.     But Collision always knew that its technology would be useful in end user devices like cell phones, tablets, and computers; and especially in mobile devices, since the low complexity of Collision's techniques relative to other alternatives made them well suited for devices with computational and power constraints.

22.     Thus, Collision reached out to Apple as early as 2015 to introduce the Collision portfolio to Apple.

23.     Collision's founder, Mr. Stan Fry, had a lengthy history with Apple, and over the ensuring years Collision had extensive discussions with Apple about the Collision portfolio.

24.     Collision provided patent lists, explanations of the relevant technology and likely use cases for it, detailed explanations of potential infringements or the types of features that would infringe Collision's patents, and detailed claim charts setting forth Apple's potential infringement of the Asserted Patents.

25.     Apple never took a license to Collision's patent portfolio.

26.     In 2025, a jury found that Apple's chief competitor, Samsung, infringed the Asserted Patents, and awarded Collision $445 million in past damages for that infringement. The case remains pending.

27.     Based on the jury's findings against Samsung, which uses some of the same cellular chip suppliers as Apple, Collision believes Apple infringes the Asserted Patents in the same way found as to Samsung.

28.     Based on the parties' lengthy history, Apple received actual notice of the Asserted Patents and its infringement of them, or obtained information sufficient that it should have known of or was willfully blinding itself to its infringement.

## ALLEGATIONS OF PATENT INFRINGEMENT

### A.     The Accused Products

29.     On information and belief, Apple makes, uses, sells, offers for sale, and/or imports, in/into the United States, products that implement and practice Collision's proprietary wireless technologies.  On information and belief, Apple products sold in the damages period that provide 4G, 5G or Wi-Fi connectivity infringe at least one claim of the Asserted Patents and comprise the "Accused Products" in this case.[1]

30.     Exemplary Accused Products include, but are not limited to:

---

[1] The Accused Products include all configuration, colors, sizes, and variations.

- iPhone 17/ 17 Air / 17 Pro /17 Pro Max
- iPhone 16 / 16e / 16 Pro / 16 Pro Max / 16 Plus
- iPhone 15 / 15 Pro / 15 Pro Max / 15 Plus
- iPhone 14 / 14 Pro / 14 Pro Max / 14 Plus
- iPhone 13 / 13 Pro / 13 Pro Max / 13 mini
- iPhone 12 / 12 Pro / 12 Pro Max / 12 mini
- iPhone 11 / 11 Pro / 11 Pro Max
- iPhone X / XS / XS Max / XR
- iPhone SE (3rd gen, 2022)
- iPhone SE (2nd gen, 2020)
- iPad (all generations sold in damages period)
- iPad Mini (all generations sold in damages period)
- iPad Air (all generations sold in damages period)
- iPad Pro (all generations sold in damages period)
- Apple Watch (all generations sold in damages period)
- MacBook Air (all generations sold in damages period)
- MacBook Pro (all generations sold in damages period)
- Mac Mini (all generations sold in damages in damages period)
- iMac (all generations sold in damages in damages period)
- Mac Pro (all generations sold in damages in damages period)
- Mac Studio (all generations sold in damages period)

31. The exemplary products listed in this complaint are non-exhaustive and non-limiting. Collision's allegations include all Apple products with the Accused Instrumentalities that infringed spanning the entire damages period of this case.

### B. Acts of Patent Infringement

32. Collision incorporates by reference the preceding paragraphs as if fully set forth herein.

33. As set forth below, Apple's Accused Products incorporate, without any license from Collision, 4G, 5G, and Wi-Fi technology protected by Collision's Asserted Patents.

34. Apple, directly or by controlling the activities of its subsidiaries, has directly infringed, and continues to directly infringe, the Asserted Patents under 35 U.S.C. § 271(a) by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or importing into this District and elsewhere in the United States, one or more of its Accused Products.

35. For example, Apple sells, and offers for sale infringing devices to its customers, subsidiaries, distributors, retailers, partners, cell-service providers, and/or end users in the United States.

36. On information and belief, Apple engages in the designing, developing, and manufacturing of the Accused Products sold, used, and offered for sale in the United States. On information and belief, Apple is involved in sales of the Accused Products, as well as the after sales and corporate functions pertaining to the Accused Products.

37. Apple has indirectly infringed the Asserted Patents under 35 U.S.C. § 271(b) by actively inducing infringement by others, such as its subsidiaries, distributors, retailers, partners, cell-service providers, and end-user customers, by, for example, implementing the infringing features in its cellular and Wi-Fi products, encouraging its users to take advantage of those features

within the United States.  Because Apple performed these acts with full knowledge of the Asserted Patents and their infringement thereof, it has specifically intended others, including its subsidiaries, distributors, retailers, partners, cell-service providers, and end-user customers to infringe the Asserted Patents knowing its subsidiaries, distributors, retailers, partners, cell-service providers, and end-user customers' acts constitute infringement.

38.     For example, Apple's advertising, sales, and/or technical materials related to the Accused Products contained and continue to contain instructions, directions, suggestions, and/or invitations that invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause its subsidiaries, distributors, retailers, partners, cell-service providers, and end-user customers to directly infringe at least one claim of each of the Asserted Patents, either literally or under the doctrine of equivalents.  Apple's activities also encourage Apple's subsidiaries, distributors, retailers, partners, cell-service providers, and end-user customers to use features that infringe Collision's Asserted Patents, including the 4G, 5G, and Wi-Fi capabilities of the Accused Products.

39.     On information and belief, Apple has provided technical documentation and training materials to its subsidiaries, distributors, retailers, partners, cell-service providers, and end-user customers, and the public that cause end users of the Accused Products to utilize the products in a manner that directly infringe on one or more claims of the Asserted Patents, and engaged in such inducement to promote the sales of the Accused Products (i.e. through user manuals, product support, marketing materials, technical materials, and training materials) to actively induce the end users of the Accused Products to infringe the Asserted Patents.

40.     Further, Apple has made, used, sold, offered to sell, imported and/or encouraged the making, using, selling, offering to sell, or importing of the Accused Products despite knowing

11

of an objectively high likelihood that its actions constituted infringement of the Asserted Patents at all times relevant to this suit.

41.     As discussed above, Collision engaged for years in discussions with Apple that constitute notice of the Asserted Patents and Apple's infringement thereof.

42.     For the reasons described above, Apple's infringement of the Asserted Patents has been willful and egregious.

43.     Apple's acts of infringement have caused damage to Collision, and Collision is entitled to recover damages incurred as a result of Apple's wrongful acts.

**COUNT I: INFRINGEMENT OF THE '703 PATENT**

44.     Plaintiff incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

45.     Defendant was aware of this Asserted Patent and of its infringement at least as early as their communications with Collision on or around 2015.  Defendant has willfully infringed the '703 patent.

46.     Defendant has directly infringed the '703 patent by making, using, selling, offering for sale, or importing into the United States products that infringe the '703 Patent including, but not limited to 4G UE devices and 5G UE devices, which are equipped with interference cancellation technology ("Accused 4G and 5G UE Instrumentalities"), and Wi-Fi devices, which are equipped with interference cancellation technology ("Accused Wi-Fi Instrumentalities").

47.     At trial in the recent *Collision v. Samsung* matter, Collision proved and a jury found that Samsung infringed claims 1 and 5 of the '703 patent via the SU-MIMO functionality in its 4G cellular devices ("Samsung Infringing Devices").  *See Collision Communications, Inc. v. Samsung Electronics Co., Ltd.*, Case No. 2:23-cv-587-JRG, Dkt. 312 (E.D. Tex. Oct. 10, 2025) (Jury Verdict).  In explaining infringement, Collision's expert witness went through each element of each

claim and explained how Samsung infringed.  That analysis is incorporated herein by reference. *See id.*, Dkt. 317.  He analyzed Samsung's own cellular chips, and also explained that the Qualcomm and Mediatek chips used in some Samsung phones have equivalent functionality that also infringes.

48.    On information and belief, Apple's Accused Products use many of the same Qualcomm modems as those found in the Samsung Infringing Devices.  For example, the Samsung Galaxy S23 uses the Qualcomm Snapdragon X70 modem, and the Apple iPhone 15 uses the same Qualcomm Snapdragon X70.

49.    Apple's Accused Products perform the same SU-MIMO functionality as the Samsung Infringing Devices, at least parts of which are dictated by applicable cellular standards.

50.    Because Apple's Accused Products operate in the same interference-laden environment as the Samsung Infringing Devices, and need to compete with the Samsung Infringing Devices in performance, spectral efficiency, download speeds, and other metrics improved by the '703 patent, Apple's Accused Products need to perform the same advanced interference cancellation techniques.

51.    Thus, on information and belief, the Apple Accused Products infringe at least one claim of the '703 patent in the same or substantially similar way as the Samsung Infringing Devices.

52.    Furthermore, because the 5G and Wi-Fi networks engaged by the Apple Accused Products also perform SU-MIMO functionality and share many of the same interference characteristics as the 4G networks addressed above, on information and belief Apple's Accused Products infringe at least one claim of the '703 patent via 5G and Wi-Fi as well.

53.     Plaintiff reserves the right to identify any other claims of the '703 patent in the disclosure of infringement contentions in this action.

54.     Further discovery may reveal additional infringing products and/or functionalities

55.     Defendant has also indirectly infringed the '703 Patent by inducing infringement by others, such as end-user customers, by, for example, encouraging its users to take advantage of the 4G, 5G, and Wi-Fi capabilities of the Accused Products.

56.     Plaintiff is entitled to recover damages adequate to compensate it for Defendant's infringement or at minimum a reasonable royalty.  Due to the willful nature of Apple's infringement, Collision is also entitled to enhanced damages.

57.     To the extent applicable, Collision has complied with the marking requirements set forth in 35 U.S.C. § 287.  At a minimum, Apple has known about the Asserted Patents for years, and been well aware of what technologies they cover and what would infringe if implemented (without Collision's direct knowledge) by Apple.  Apple also received claim charts in 2024 demonstrating infringement of the '703 patent specifically.  Thus, Apple has had actual notice of infringement prior to the filing of this suit.

### COUNT II: INFRINGEMENT OF THE '651 PATENT.

58.     Plaintiff incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

59.     Defendant was aware of this Asserted Patent and of its infringement at least as early as its communications with Collision on or around 2015.  Defendant has willfully infringed the '651 patent.

60.     Defendant has directly infringed the '651 patent by, at a minimum, using and testing in the United States products that infringe the '651 Patent including, but not limited to the Accused 4G and 5G UE Instrumentalities and Accused Wi-Fi Instrumentalities.

61.    At trial in the recent *Collision v. Samsung* matter, Collision proved and a jury found that Samsung infringed claims 1 and 3 of the '651 patent (which correspond to method claims 6 and 7) via the CRS-IC functionality in the Samsung Infringing Devices. *See Collision Communications, Inc. v. Samsung Electronics Co., Ltd.*, Case No. 2:23-cv-587-JRG, Dkt. 312 (E.D. Tex. Oct. 10, 2025) (Jury Verdict). In explaining infringement, Collision's expert witness went through each element of each claim and explained how Samsung infringed. *See id.*, Dkt. 317. That analysis is incorporated herein by reference. He analyzed Samsung's own cellular chips, and also explained that the Qualcomm and Mediatek chips used in some Samsung phones have equivalent functionality that also infringes.

62.    On information and belief, Apple's Accused Products use many of the same Qualcomm modems as those found in the Samsung Infringing Devices. For example, the Samsung Galaxy S23 uses the Qualcomm Snapdragon X70 modem, and the Apple iPhone 15 uses the same Qualcomm Snapdragon X70.

63.    Apple's Accused Products perform the same CRS-IC functionality as the Samsung Infringing Devices, at least parts of which are dictated by applicable cellular standards.

64.    Because Apple's Accused Products operate in the same interference-laden environment as the Samsung Infringing Devices, and need to compete with the Samsung Infringing Devices in performance, spectral efficiency, download speeds, and other metrics improved by the '651 patent, Apple's Accused Products need to perform the same advanced interference cancellation techniques.

65.    Thus, on information and belief, the Apple Accused Products infringe at least claim 6 of the '651 patent in the same or substantially similar way as the Samsung Infringing Devices.

66.     Furthermore, because the 5G and Wi-Fi networks engaged by the Apple Accused Products also perform interference cancellation and reference signaling functionality and share many of the same interference characteristics as the 4G networks addressed above, on information and belief Apple's Accused Products infringe the '651 patent via 5G and Wi-Fi as well.

67.     Plaintiff reserves the right to identify any other claims of the '651 patent in the disclosure of infringement contentions in this action.

68.     Further discovery may reveal additional infringing products.

69.     Defendant also indirectly infringes the '651 Patent by inducing infringement by others, such as end-user customers, by, for example, encouraging its users to take advantage of the 4G, 5G, and Wi-Fi capabilities of the Accused Products.

70.     Plaintiff is entitled to recover damages adequate to compensate it for Defendant's infringement or at minimum a reasonable royalty.  Due to the willful nature of Apple's infringement, Collision is also entitled to enhanced damages.

71.     To the extent applicable, Collision has complied with the marking requirements set forth in 35 U.S.C. § 287.  At a minimum, Apple has known about the Asserted Patents for years, and been well aware of what technologies they cover and what would infringe if implemented (without Collision's direct knowledge) by Apple.  Thus, Apple has had actual notice of infringement prior to the filing of this suit.

### COUNT IV: INFRINGEMENT OF THE '492 PATENT.

72.     Plaintiff incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

73.     Defendant was aware of this Asserted Patent and of its infringement at least as early as their communications with Collision on or around 2015.  Defendant has and currently continues to willfully infringe the '492 patent.

74.     Defendant has directly infringed, and continues to directly infringe, the '492 patent by making, using, selling, offering for sale, or importing into the United States products that infringe the '492 Patent including, but not limited to the Accused 4G and 5G UE Instrumentalities and Accused Wi-Fi Instrumentalities.

75.     At trial in the recent *Collision v. Samsung* matter, Collision proved and a jury found that Samsung infringed claim 1 of the '492 patent via the SU-MIMO functionality in the Samsung Infringing Devices.  *See Collision Communications, Inc. v. Samsung Electronics Co., Ltd.*, Case No. 2:23-cv-587-JRG, Dkt. 312 (E.D. Tex. Oct. 10, 2025) (Jury Verdict).  In explaining infringement, Collision's expert witness went through each element of each claim and explained how Samsung infringed.  That analysis is incorporated herein by reference.  *See id.*, Dkt. 317.  He analyzed Samsung's own cellular chips, and also explained that the Qualcomm and Mediatek chips used in some Samsung phones have equivalent functionality that also infringes.

76.     On information and belief, Apple's Accused Products use many of the same Qualcomm modems as those found in the Samsung Infringing Devices.  For example, the Samsung Galaxy S23 uses the Qualcomm Snapdragon X70 modem, and the Apple iPhone 15 uses the same Qualcomm Snapdragon X70.

77.     Apple's Accused Products perform the same SU-MIMO functionality as the Samsung Infringing Devices, at least parts of which are dictated by applicable cellular standards.

78.     Because Apple's Accused Products operate in the same interference-laden environment as the Samsung Infringing Devices, and need to compete with the Samsung Infringing Devices in performance, spectral efficiency, download speeds, and other metrics improved by the '492 patent, Apple's Accused Products need to perform the same advanced interference cancellation techniques.

79.     Thus, on information and belief, the Apple Accused Products infringe at least claim 1 of the '492 patent in the same or substantially similar way as the Samsung Infringing Devices.

80.     Furthermore, because the 5G and Wi-Fi networks engaged by the Apple Accused Products also perform SU-MIMO functionality and share many of the same interference characteristics as the 4G networks addressed above, on information and belief Apple's Accused Products infringe the '492 patent via 5G and Wi-Fi as well.

81.     Plaintiff reserves the right to identify any other claims of the '492 patent in the disclosure of infringement contentions in this action.

82.     Further discovery may reveal additional infringing products.

83.     Defendant also indirectly infringes the '492 patent by inducing infringement by others, such as end-user customers, by, for example, encouraging its users to take advantage of the 4G, 5G, and Wi-Fi capabilities of the Accused Products.

84.     Defendant's continued infringement of the '492 patent has damaged and will continue to damage Plaintiff.

85.     Plaintiff is entitled to recover damages adequate to compensate it for Defendant's infringement or at minimum a reasonable royalty.  Plaintiff is also entitled to equitable and injunctive relief (with injunctive relief limited to the patent term).  Due to the willful nature of Apple's infringement, Collision is also entitled to enhanced damages.

86.     To the extent applicable, Collision has complied with the marking requirements set forth in 35 U.S.C. § 287.  At a minimum, Apple has known about the Asserted Patents for years, and been made well aware by Collision from many, detailed conversations of what technologies the patents cover and what would infringe if implemented (without Collision's direct knowledge)

by Apple. Apple also received claim charts in 2024 demonstrating infringement of the '492 patent specifically. Thus, Apple has had actual notice of infringement prior to the filing of this suit.

**COUNT VI: INFRINGEMENT OF THE '505 PATENT.**

87.    Plaintiff incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

88.    Defendant was aware of this Asserted Patent and of its infringement at least as early as their communications with Collision on or around 2015. Defendant has willfully infringed the '505 patent.

89.    Defendant has directly infringed the '505 patent by making, using, selling, offering for sale, or importing into the United States products that infringe the '505 Patent including, but not limited to 4G UE devices and 5G UE devices, which are equipped with interference cancellation technology ("Accused 4G and 5G UE Instrumentalities").

90.    At trial in the recent *Collision v. Samsung* matter, Collision proved and a jury found that Samsung infringed claim 1 of the '505 patent via the CRS-IC functionality in the Samsung Infringing Devices. *See Collision Communications, Inc. v. Samsung Electronics Co., Ltd.*, Case No. 2:23-cv-587-JRG, Dkt. 312 (E.D. Tex. Oct. 10, 2025) (Jury Verdict). In explaining infringement, Collision's expert witness went through each element of each claim and explained how Samsung infringed. That analysis is incorporated herein by reference. *See id.*, Dkt. 317. He analyzed Samsung's own cellular chips, and also explained that the Qualcomm and Mediatek chips used in some Samsung phones have equivalent functionality that also infringes.

91.    On information and belief, Apple's Accused Products use many of the same Qualcomm modems as those found in the Samsung Infringing Devices. For example, the Samsung Galaxy S23 uses the Qualcomm Snapdragon X70 modem, and the Apple iPhone 15 uses the same Qualcomm Snapdragon X70.

19

92.     Apple's Accused Products perform the same CRS-IC functionality as the Samsung Infringing Devices, at least parts of which are dictated by applicable cellular standards.

93.     Because Apple's Accused Products operate in the same interference-laden environment as the Samsung Infringing Devices, and need to compete with the Samsung Infringing Devices in performance, spectral efficiency, download speeds, and other metrics improved by the '505 patent, Apple's Accused Products need to perform the same advanced interference cancellation techniques.

94.     Thus, on information and belief, the Apple Accused Products infringe at least claim 1 of the '505 patent in the same or substantially similar way as the Samsung Infringing Devices.

95.     Furthermore, because the 5G networks engaged by the Apple Accused Products also perform reference signaling functionality and share many of the same interference characteristics as the 4G networks addressed above, on information and belief Apple's Accused Products infringe the '505 patent via 5G as well.

96.     Plaintiff reserves the right to identify any other claims of the '505 patent in the disclosure of infringement contentions in this action.

97.     Further discovery may reveal additional infringing products.

98.     Defendant has also indirectly infringed the '505 Patent by inducing infringement by others, such as end-user customers, by, for example, encouraging its users to take advantage of the 4G, 5G, and Wi-Fi capabilities of the Accused Products.

99.     Plaintiff is entitled to recover damages adequate to compensate it for Defendant's infringement or at minimum a reasonable royalty.  Due to the willful nature of Apple's infringement, Collision is also entitled to enhanced damages.

100.     To the extent applicable, Collision has complied with the marking requirements set forth in 35 U.S.C. § 287.  At a minimum, Apple has known about the Asserted Patents for years, and been made well aware by Collision from many, detailed conversations of what technologies the patents cover and what would infringe if implemented (without Collision's direct knowledge) by Apple.  Apple also received detailed information in 2020 demonstrating infringement of the '505 patent specifically.  Thus, Apple has had actual notice of infringement prior to the filing of this suit.

### **PRAYER FOR RELIEF**

101.     WHEREFORE, Plaintiff respectfully requests the following relief:

a.  a judgment in favor of Plaintiff that Defendant has infringed, either literally and/or under the doctrine of equivalents, at least one claim of each of the Asserted Patents;

b.  a judgment that Defendant's infringement has been and is willful;

c.  a judgment and order requiring Defendant to pay Plaintiff its damages, costs, expenses, and any enhanced damages to which Plaintiff is entitled for Defendant's infringement;

d.  a judgment and order requiring Defendant to provide an accounting and to pay supplemental damages to Plaintiff, including without limitation, pre-judgment and post-judgment interest;

e.  a judgment and order permanently enjoining Defendant and any of its officers, directors, agents, servants, subsidiaries, affiliates, divisions, branches, parents, and/or those in association with them from further infringing the Asserted Patents during the duration of their patent term;

f.  a judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding Plaintiff its reasonable attorney fees against Defendant; and

g.  any and all other relief as the Court may deem appropriate and just under the circumstances.

## DEMAND FOR JURY TRIAL

102.  Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands trial by jury on all claims and issues so triable.

DATED: March 25, 2026

Respectfully submitted,

*/s/ Bradley W. Caldwell*
Bradley W. Caldwell (TX Bar No. 24040630)
bcaldwell@caldwellcc.com
J. Austin Curry (TX Bar No. 24059636)
acurry@caldwellcc.com
Justin T. Nemunaitis (TX Bar No. 24065815)
jnemunaitis@caldwellcc.com
Christopher S. Stewart
(TX Bar No. 24079399)
cstewart@caldwellcc.com
John F. Summers (TX Bar No. 24079417)
jsummers@caldwellcc.com
Seth R. Reich (TX Bar No. 24088283)
sreich@caldwellcc.com
Aisha Mahmood Haley
(TX Bar No. 24139895)
ahaley@caldwellcc.com
**CALDWELL CASSADY & CURRY P.C.**
2121 N Pearl Street, Suite 1200
Dallas, Texas 75201
Telephone: (214) 888-4848
Facsimile: (214) 888-4849

Mark D. Siegmund
Texas Bar No. 24117055
**CHERRY JOHNSON SIEGMUND JAMES PC**
Bridgeview Center
7901 Fish Pond Road, 2nd Floor
Waco, Texas   76710
Telephone:  (254) 732-2242
Facsimile:   (866) 627-3509
msiegmund@cjsjlaw.com

**ATTORNEYS FOR PLAINTIFF COLLISION COMMUNICATIONS, INC.**